*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
March 12, 2020

Plaintiff-Appellee,

v

No. 343414
Wayne Circuit Court
LC No. 17-000756-01-FC

HECTOR ALEXSANDRO MONTANEZ,

Defendant-Appellant.

Before: STEPHENS, P.J., and CAVANAGH and SERVITTO, JJ.

PER CURIAM.

Defendant appeals as of right his jury convictions of second-degree murder, MCL 750.317, carrying a weapon with unlawful intent, MCL 750.226, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. We affirm.

Defendant's convictions arise from the December 17, 2016 shooting death of Jeffrey Pitman outside of Club Venus in Detroit. At trial, defendant did not dispute that he shot Pitman, but primarily claimed that he acted in self-defense.

## I. RIGHT TO COUNSEL

Defendant argues that the trial court erred by denying his motion to suppress his custodial statements on the ground that the police improperly questioned him in violation of his right to counsel. Specifically, defendant argues that the court erred by finding that his request for an attorney during his custodial interrogation was equivocal. We disagree. This Court reviews a trial court's factual findings at a suppression hearing for clear error and its legal conclusions de novo. *People v Frohriep*, 247 Mich App 692, 702; 637 NW2d 562 (2001).

At the start of the police's interview with defendant, defendant waived his *Miranda*[1] rights and agreed to talk to the police. During the interview, defendant admitted grabbing his shotgun

---

[1] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

from his car and, after firing it once into the air, fired it at Pitman. Later, the topic of attorneys came up in the following exchange, which is the crux of defendant's argument on appeal:

*A.* I went to the car and grabbed something.

*Q.* What'd you grab?

*A.* Shotgun. Shot it in the air. And then—that was—I just went to him in self-defense—I told him, I screamed at him, "Hey, you're not going to do this to us! I don't care." And that—that was it.

*Q.* So you went to your car and got a shotgun and shot him.

*(no verbal response)*

*Q.* So, I want to tell you that everything that you've—everything that we're coming to you about we already know because everything single thing that took place is on video.

*A. (not discernable)* I know. Not to cut you off, . . . you know, word gets around you know, you guys obviously know. But I—I just know—I kinda know stuff that's been said and like some of the stuff is real false, and I don't want nobody else getting drug into whatever you know. *And I know my mom put two lawyers on here, and I put another lawyer on here, but I'd rather have just my lawyer, if it's possible.*

*Q.* Oh, dear, you know what, no . . . she's called people to see if somebody—she can afford someone, and she can't afford anyone. That has nothing to do with us.[2]

The police continued their questioning.

"[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and . . . the police must explain this right to him before questioning begins." *Davis v United States*, 512 US 452, 457; 114 S Ct 2350; 129 L Ed 2d 362 (1994). Thus, if a suspect "effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement officers are free to question him." *Id*. at 458. "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id*. "However, the defendant's invocation of his right to counsel must be unequivocal." *People v Tierney*, 266 Mich App 687, 711; 703 NW2d 204 (2005). Consequently, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have

---

[2] A transcript of defendant's police interview was not prepared. The quoted exchange is based on our review of a video recording of defendant's interview.

understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 US at 459.

At the suppression hearing, the trial court ruled that defendant's rights were not violated because defendant's statement regarding having just his lawyer "on here" was not an unequivocal request to have a lawyer present at that time. We find no error in this ruling.

In *People v McKinney*, 488 Mich 1054, 1054; 794 NW2d 614 (2011), the Michigan Supreme Court held that the defendant's statement that he would "just as soon wait" until he had an attorney before talking to the police was not an unequivocal assertion of the right to counsel. Likewise, in *Tierney*, 266 Mich App at 711, this Court held that the defendant's statements, "Maybe I should talk to an attorney" and "I might want to talk to an attorney," were inadequate to assert the right to counsel. And in *People v Adams*, 245 Mich App 226, 238; 627 NW2d 623 (2001), this Court held that the question "Can I talk to [a lawyer] right now?" was not an unequivocal invocation to the right of counsel. In *Adams*, this Court explained that this question merely represented "inquiries into the way the process worked" and was "not an actual demand for an attorney." *Id*.

In this case, defendant's statement "I know my mom put two lawyers on here, and I put another lawyer on here, but I'd rather have just my lawyer, if it's possible" is similar to the statements in *McKinney*, *Tierney*, and *Adams* because there was no clear assertion of the right to consult counsel. Instead, the most apparent and reasonable meaning of defendant's statement is that he wanted to be represented in the future by counsel of his choosing instead of by one of the attorneys his mother had identified. Importantly, nowhere in defendant's statement did he state that he wanted to have his (or any other) lawyer present *now*, which is the salient inquiry. See *Davis*, 512 US at 459 (a defendant "must articulate his desire to have counsel present"); *Adams*, 245 Mich App at 238 ("The question here is whether defendant's statement . . . constitutes a clear request for an attorney."). Thus, to the extent defendant's statement could be viewed as a present request for counsel, it was ambiguous. Accordingly, the trial court did not err by ruling that defendant's statement was inadequate to invoke his right to counsel.

## II. TRIAL COURT'S COMMENTS

Defendant argues that he was denied a fair trial because the trial judge pierced the veil of judicial impartiality when he made certain comments during defendant's cross-examination. We disagree. Whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo. *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

During the prosecution's cross-examination of defendant, defendant stated that he was denied some rights during his interview with the police. The trial court, in response, made some comments clarifying that the admissibility of defendant's police interview had already been determined. The full exchange is presented here:

> *Q*. Is it also a coincidence that you got rid of the shotgun after you shot Mr. Pitman?

> *A*. No. I traded it for a pistol thinking I needed protection for myself.

-3-

*Q.* Okay. So, again, you got rid of the shotgun after you shot Mr. Pitman; yes or no?

*A.* No. I traded it.

*Q.* Is that the – it's not the same as getting rid of it?

*A.* No.

*Q.* You didn't have it anymore, did you?

*A.* No but I had another pistol or a pistol.

*Q.* You keep a gun on you?

*A.* Yeah. I said I keep the shotgun for protection.

*Q.* Okay. And you don't have a license to carry a firearm, do you?

*A.* No, I don't, but that shotgun was in my name, so.

*Q.* Okay. Even though you told Detective Ferency that you bought it off of the street from a buddy?

*A.* Yeah.

\* \* \*

*Q.* Now going back to the question about your mother telling you the police were looking for you and you indicated you never talked to her about that, correct?

*A.* No.

(Whereupon the video was then played)

*Q.* So you would admit that you told the police you talked to your mother about this shooting, correct?

*A.* Yeah.

*Q.* Okay. And so that's different from what you just testified to?

*A.* But I never did.

*Q.* So you're lying again when you were talking to Detective Ferency?

*A.* I guess so, yeah.

*Q.* Well I don't want you to guess.

-4-

Were you lying when you were talking to Detective Ferency or are you lying what you're telling the jury now?

*A.* I was lying then I guess because I felt like they violated my rights. I never gave me food –

*[The Prosecutor]*: Your Honor --

THE COURT: The defendant's confession has been ruled admissible, there was a hearing on it and --

*[Defense Counsel]*: I object to going into that in front of the jury, Your Honor.

THE COURT: Well, he just blurted out that they never gave him his rights which is --

*[Defendant]*: They never gave me my lawyer Your Honor. I'm sorry.

THE COURT: They -- this issue has been explored fully in a hearing before the trial and the confession has been ruled admissible.

*[Defense Counsel]*: I object to the Court saying that the jury --

THE COURT: Your client keeps things blurting out to things not true and not accurate.

*[Defense Counsel]*: I object.

THE COURT: If he keeps his mouth shut --

*[Defense Counsel]*: You shouldn't comment on the witness's testimony in front of the jury.

THE COURT: I didn't comment on his testimony[;] I'm setting it straight.

The confession has been ruled admissible. There's already been an argument about whether or not he got all of his rights or got his lawyer when he wanted it or asked for it and all of those rulings went against him and that's why the confession came into evidence.

*[Defense Counsel]*: I object to the Court saying this in front of the jury.

THE COURT: Duly noted. Now continue.

"A trial judge's conduct deprives a party of a fair trial if a trial judge's conduct pierces the veil of judicial impartiality." *Stevens*, 498 Mich at 170. "A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the

circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party." *Id*. at 171.

> This inquiry requires a fact-specific analysis. A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality. Ultimately, the reviewing court should not evaluate errors standing alone, but rather consider the cumulative effect of the errors.
>
> These errors must be considered within the context of a given case, i.e., the totality of the circumstances, to determine whether the judge demonstrated the appearance of advocacy or partiality on the whole. [*Id*. at 171-172 (citations omitted).]

In analyzing the totality of the circumstances, courts are to inquire into a variety of factors, which include and are not limited to (1) "the nature of the judicial conduct," (2) "the tone and demeanor of the trial judge," (3) "the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein," (4) "the extent to which the judge's conduct was direct at one side more than the other," and (5) "the presence of any curative instructions." *Id*. at 172.

At the outset, defendant frames the issue as the trial court openly questioning his credibility, such that the court exhibited its "disbelief of [defendant's] testimony." While the trial judge did state that defendant was saying things that were not "true" and "accurate," we must view those comments in context. Looking at the comments as a whole and in context, it is apparent that the trial court was solely addressing defendant's contention that his constitutional rights had been violated during his interrogation by the police. The court was addressing defendant's statements in court that "I felt like they violated my rights" and "[t]hey never gave me my lawyer." As the trial judge explained, the issue, as a matter of law, had already been decided and was not for the jury to consider. Considered in context, it is not reasonable to view the trial judge's comments as an attack on defendant's overall credibility. The comments were limited to defendant's claim that his rights had been violated during his custodial interrogation. The judge made this very clear in his commentary:

> [T]his issue has been explored fully in a hearing before the trial and the confession has been ruled admissible.
>
> * * *
>
> The confession has been ruled admissible. There's already been an argument about whether or not he got all of his rights or got his lawyer when he wanted it or asked for it and all of those rulings went against him and that's why the confession came into evidence.[3]

---

[3] On appeal, defendant also cursorily argues that trial court's use of the word "confession" was improper. Because of defendant's failure to adequately brief this particular argument, it could be

Therefore, while the trial court did state that defendant was saying things that were not true and not accurate, this was confined to defendant's comments regarding the violation of his rights. It was proper for the court to interject in order to explain that the issue had already been settled and the jury would not have to decide that issue. It is understood that a trial judge "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." MRE 611(a). Informing the jurors that the issue whether defendant's rights had been violated or that his statements to the police were admissible were not for them to decide was consistent with MRE 611(a)'s mandate, particularly subsections (1) and (2).

Given the limited context of the trial judge's comments, defendant was not denied a fair trial. Again, to stress, the trial judge's comments were limited to defendant's claim that his rights had been violated during his custodial interrogation. Because the comments were solely focused on the fact that the issue regarding those rights had already been decided by the court, we cannot say that it "demonstrates the appearance of advocacy or partiality on the whole." *Stevens*, 498 Mich at 172. The judge merely was stating an undeniable fact: as already determined by the court, defendant's rights had not been violated. Stating such a truth, even though unfavorable to defendant, did not demonstrate any partiality. Furthermore, the trial court instructed the jurors that any comment the court made during trial was not evidence and that it was not trying to express a personal opinion about the case. The court advised the jurors that if they believed that it had an opinion about the case, they should not pay attention to it and should decide the case as they saw fit. This factor further weighs in favor of finding that the trial court's comments did not improperly influence the jury. See *id*.

### III. REDACTIONS FROM POLICE INTERROGATION

Defendant next argues that the trial court erred when it ruled that certain portions of his recorded interview with the police were not admissible. We disagree. An appellate court reviews a trial court's decision whether to admit or exclude evidence for an abuse of discretion. *People v Smith*, 282 Mich App 191, 194; 772 NW2d 428 (2009). A court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *People v Dixon-Bey*, 321 Mich App 490, 496; 909 NW2d 458 (2017).

Before the video of the police's interrogation of defendant was admitted into evidence, the prosecution sought to have certain portions redacted. Defendant did not have an issue with many

---

deemed abandoned. See *People v Martin*, 271 Mich App 280, 315; 721 NW2d 815 (2006). Regardless, because defendant's objection at trial was related to the trial court's characterization of defendant's testimony as not true, this aspect of his issue on appeal is not preserved, see *People v Asevedo*, 217 Mich App 393, 398; 551 NW2d 478 (1996) ("An objection based on one ground at trial is insufficient to preserve an appellate attack based on a different ground."), and we discern no plain or obvious error that affected defendant's substantial rights, see *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007). While defendant maintained that his shooting of Pitman was justified, he nonetheless "confessed" to shooting Pitman.

of the redactions that dealt with personal information, but he did object to two of the proposed redactions.

The first redaction included the interviewing detective's question asking defendant if he had ever been in jail before and defendant's answer that he had not. The prosecutor argued that the information was not admissible, and the trial court agreed because it not was relevant and its primary purpose would be to try to garner sympathy with the jury, which was not permissible. Defendant argued that it was relevant to show his naivete while answering the questions from the police. The trial court observed that if the converse were true—that defendant had been in jail 15 times, for example—that also would not be admissible to show that defendant was not inexperienced.

As a cornerstone of evidentiary law, only relevant evidence is admissible. MRE 402. 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Defendant argued below that the evidence of his lack of experience with jail and law enforcement showed that he was naive, which would explain why he provided some untrue answers to the police's questions. This contention seems highly dubious on its face. Just because a person lacks experience with the police or law enforcement does not tend to show that they will forget what the truth is when answering questions, or explain why they would be more prone to lie to the police. Therefore, the evidence of defendant's lack of experience with law enforcement was not relevant, and the trial court did not abuse its discretion when it allowed redaction of this portion of the video.

Moreover, any error would have been harmless because the jury *was* presented with the fact that defendant had never been involved with law enforcement before. A preserved evidentiary error is presumed harmless unless, " 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *People v Lukity*, 460 Mich 484, 496; 596 NW2d 607 (1999), quoting MCL 769.26. During cross-examination, the prosecution was questioning defendant about him reading and signing his waiver of his *Miranda* rights at the police station. While defendant acknowledged at trial that he had read and signed the waivers, he maintained, "I didn't know what that was really about because I never been in this situation." Moreover, included in the portion of the interview presented to the jury was defendant's statement, "The reason why I didn't turn myself in or anything is because this is the first time this has ever happened to me." Therefore, despite the redactions that took place in the video, the jury still was informed that defendant's interview by the police was a new experience for him.

The second redaction that defendant challenges on appeal is the redaction of the detective's statement during her interview with defendant, where she states, "[Y]ou know how the defendant's life is life terms. You understand that, right." We question the accuracy of the trial transcript because the phrase "the defendant's life is life terms" appears to be nonsensical. Regardless, the parties on appeal understand that the gist of the statement was that defendant was facing the possibility of mandatory life in prison. Defendant claims that the threat of a life sentence "left him in such a state of panic and fear that he was understandably less than completely forthcoming during his interrogation." However, a jury is not to consider possible penalty or punishment when rendering a verdict. *People v Warner*, 289 Mich 516, 521; 286 NW 811 (1939); see also M Crim

JI 2.23. Thus, the trial court made a principled decision to preclude the statement and as a result did not abuse its discretion when it ruled that the detective's statement was inadmissible.

Moreover, any error in allowing either or both redactions was also harmless because the evidence was overwhelming that defendant shot and killed Pitman, and that defendant did not act in self-defense. It was undisputed that after defendant and his stepfather, Vincent Benevides, approached Pitman and Pitman purportedly threatened defendant, both defendant and Benevides turned their backs on Pitman and returned to their vehicles. Despite Benevides telling defendant to leave, defendant went to his car, retrieved his shotgun, and fired several shots in Pitman's direction. The fact that both Benevides and defendant turned their backs on Pitman and walked slowly away from him shows that they did not think they were in imminent danger of being shot at the time. See *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013) (recognizing that self-defense requires the person to "have an honest and reasonable belief that there is a danger of death, great bodily harm, or a sexual assault in order to justify the use of deadly force"), citing MCL 780.972(1). Further, it is clear from the surveillance video that when defendant first began firing his weapon from a considerable distance away (an apparent distance of 40 to 50 feet away), Pitman was not even looking at defendant. Instead, Pitman was knocking on the rear door of the club to be let back in. In sum, the video evidence eviscerates any claim of self-defense, which was defendant's primary defense at trial. As such, it is not more probable than not that redaction of the disputed portions of defendant's interview with the police was outcome-determinative. See *Lukity*, 460 Mich at 496.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In a supplemental brief, defendant argues that he was denied the effective assistance of counsel because counsel failed to properly investigate, and make arguments related to, a pepper spray gun that was discovered in Pitman's possession at the hospital where he died. We disagree.

Generally, claims of ineffective assistance of counsel involve a mixed question of law and fact. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews a trial court's factual findings for clear error, and any constitutional determinations are reviewed de novo. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). However, when no evidentiary hearing is held, as is the case here, this Court's review "is limited to mistakes apparent on the record." *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

Defendants have the guaranteed right to the effective assistance of counsel. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Aceval*, 282 Mich App 379, 386; 764 NW2d 285 (2009). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *LeBlanc*, 465 Mich at 578. Generally, to establish a claim of ineffective assistance, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Trakhenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). However, such performance must be measured without the benefit of hindsight. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

-9-

On the second day of trial, the prosecution received Pitman's medical records from Henry Ford Hospital. The defense was given a copy that day as well. The prosecution had obtained those records because it was questionable whether the medical examiner would appear and testify at trial. Not wanting to adjourn the trial, the trial court suggested that the medical records from the hospital could perhaps be used to show that Pitman died from a gunshot wound. This discussion became moot because the medical examiner did testify later at trial, but regardless, the medical records were admitted into evidence via stipulation.

For purposes of this issue on appeal, the medical records state that among Pitman's possessions at the hospital was a "Pepper spray gun." Defendant's main point on appeal is that this evidence clearly shows that Pitman did have a gun of some kind on the night of the shooting and that it corroborates defendant's and Benevides's claims that they saw Pitman brandish a "gun." Defendant contends that defense counsel was ineffective by not investigating this pepper spray gun more thoroughly and crafting a defense based on the results of that investigation. Defendant's argument on appeal fails for two reasons.

First, there is nothing in the record to suggest that, after reviewing the medical records, defense counsel could have obtained the actual pepper spray gun. Pitman was taken to the hospital on December 17, 2016, where he died. The medical records were not available until 14 months later. It defies reason to think that the hospital would have had Pitman's possessions after such a long time,[4] and defendant has not otherwise provided any basis for concluding that defense counsel could have obtained the actual pepper spray gun after learning of its existence.

Second, assuming counsel did perform a timely investigation into the pepper spray gun, there is no indication that an investigation would have resulted in favorable information. While apparently some types of pepper spray guns can resemble an actual firearm pistol, it is speculation that the pepper spray gun found in Pitman's possession at the hospital was one of these types. By *not* investigating, defense counsel was able to suggest to the jury that the pepper spray gun found on Pitman *was* similar-looking to a real firearm, which supported defendant's claim of self-defense.

Lastly, even if defense counsel had found the pepper spray gun and it was a near facsimile to an actual pistol, there is no reasonable probability that this would have aided defendant's claim of self-defense. Again, the video evidence was overwhelming that defendant was not being threatened at the time he shot Pitman. Therefore, even if Pitman had a pepper spray gun on him that looked like an actual firearm, it would support an honest and reasonable belief that Pitman had a lethal weapon; however, the evidence did not show that defendant had a reasonable belief that his life was in danger at the time he shot Pitman. As explained earlier, defendant was

---

[4] To the extent it could be suggested that defense counsel was ineffective for not pursuing the medical records sooner, there is no apparent reason to think that the medical records would have yielded anything beneficial to the defense. Except for defendant and Benevides, all of the witnesses, including the responding police officers and emergency medical technicians, denied seeing Pitman with a gun that night. The surveillance videos also do not show Pitman brandishing anything that resembled a firearm that night. Thus, deciding not to expend time or effort on those medical records did not fall below an objective level of reasonableness.

approximately 50 feet away from Pitman when he started to fire at Pitman, and Pitman was knocking on the rear door to the club to be let back in and was not even paying attention to defendant. No reasonable jury could have found from this evidence that defendant acted in self-defense because the jury could not have concluded that defendant had an honest and reasonable belief that his life was in danger when he shot Pitman. See MCL 780.972(1). Therefore, assuming defense counsel's performance fell below an objective level of reasonableness, defendant has not established a reasonable probability that any error was outcome-determinative.

## V. ISSUES RAISED IN DEFENDANT'S STANDARD 4 BRIEF

### A. DUE-PROCESS VIOLATION

Defendant argues that the prosecution violated his constitutional due-process rights by not timely disclosing evidence that it had a duty to disclose. We disagree. We review this unpreserved constitutional issue for plain error affecting defendant's substantial rights. See *People v Hanks*, 276 Mich App 91, 92; 740 NW2d 530 (2007).

"A criminal defendant has a due process right to obtain exculpatory evidence possessed by the prosecutor if it would raise a reasonable doubt about defendant's guilt." *People v Cox*, 268 Mich App 440, 448; 709 NW2d 152 (2005); see also *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963). In order to establish such a due-process violation, a defendant must prove the following: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014).

Defendant's claim of a *Brady* violation fails for a simple reason: there is no evidence that the prosecution suppressed, i.e., possessed yet did not turn over to defendant, the medical records. The lower court record indicates that as of the start of the second day of trial, neither the defense nor the prosecution had the medical records. Then, in the afternoon, the prosecutor stated that the medical records had just been received and copies would be provided to the defense. Those copies were made, and defense counsel acknowledged receiving a copy of the medical records at the end of the second day of trial.[5] Therefore, any contention that the prosecution suppressed the medical records is not supported by the lower court record. This is fatal to defendant's claim of a *Brady* violation.

In fact, not only were the medical records disclosed, they were admitted into evidence at trial. And contrary to defendant's assertion on appeal that the "jury was unaware" of the fact that the medical records indicate that Pitman had a pepper spray gun, the jury *was* made aware of this fact. Indeed, aside from the medical records being admitted into evidence, which thereby allowed the jury to read the information for themselves, defense counsel highlighted the presence of the pepper spray gun and argued that a pepper spray gun "look[s] exactly like a real gun" and that if

---

[5] We also note that the prosecution had no duty to seek out and discover these records any sooner. That is because, although exculpatory evidence needs to be disclosed, the duty does not extend to seeking out and finding exculpatory evidence. *People v Sawyer*, 222 Mich App 1, 5; 564 NW2d 62 (1997).

Pitman had pulled it out, defendant would have believed he was going to be shot, thereby satisfying the requirements of self-defense.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that he was denied the effective assistance of counsel because trial counsel failed to move for a new trial on the basis of newly discovered evidence. We disagree.

In order to obtain a new trial on the basis of newly discovered evidence, a defendant must show that

> "(1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." [*People v Grissom*, 492 Mich 296, 313; 821 NW2d 50 (2012) (citation omitted).]

Defendant claims that the newly discovered evidence was the medical records, which he repeatedly asserts were not discovered until *after* the trial had concluded. However, as previously explained, defendant's premise is faulty. The medical records were disclosed to defendant during trial, the jury was aware of the records because they were admitted into evidence, and defense counsel argued to the jury about the significance of the pepper spray gun found on Pitman that was listed in the medical records. Therefore, the medical records were not newly discovered evidence, and any motion for a new trial based on newly discovered evidence would have been futile. Accordingly, defendant's claim on appeal fails because it is well established that counsel is not ineffective for failing to raise a meritless motion. *Riley*, 468 Mich at 142.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Mark J. Cavanagh
/s/ Deborah A. Servitto